State of NEW MEXICO,
et al., Plaintiffs,

v.

**GENERAL ELECTRIC COMPANY,**
et al., Defendants.

**Nos. CIV991118 BSJ/KBM,**
**CIV991254 BSJ/ACT.**

United States District Court,
D. New Mexico.

June 19, 2004.

ORDER RE: SUMMARY JUDGMENT

JENKINS, Senior District Judge.

## TABLE OF CONTENTS

I.  IDENTIFYING TRIABLE ISSUES ........................................1240
    A.  Interest, Injury, Liability & Damages ................................1240
    B.  The Court's Tentative Statement of Triable Issues ......................1243
    C.  The Defendants' Motions for Summary Judgment .......................1244
        1.  General Electric ...............................................1244
        2.  ACF Industries .................................................1245
        3.  The Chevron & Texaco Defendants ...............................1245
        4.  Plaintiffs' Response.............................................1246
    D.  The Bone of Contention at Plant 83:
        Static vs.  Dynamic Remedial Systems ..............................1247
    E.  Plaintiffs' "Deep, Deep" Contaminant Plume .........................1250

II.  TRIABLE ISSUES & FED. R. CIV. P. 56 .................................1251
    A.  Standards Governing Summary Judgment .............................1251
    B.  Plaintiffs' Claims & "Specific Facts" Under Rule 56 ....................1253
    C.  Specific Facts & Plaintiffs' "Deep, Deep" Plume Theory................1254
    D.  The Intended Scope of the Existing EPA Remediation...................1257
    E.  Summary Judgment & Plaintiffs' Damages Theory......................1258
    F.  Summary Judgment & the Hydrocarbon Remediation Agreements........1263
        1.  Avoidable Consequences & Plaintiffs' Duty to Mitigate ..............1264
        2.  NMED Primary Jurisdiction & Plaintiffs' Remaining Claims.........1265
        3.  Injury & Damages Beyond the Existing
            Chevron/Texaco Remedial Systems ..............................1267
        4.  The Intended Scope of Remediation Under the HRAs ...............1267
        5.  The HRAs & the Plaintiffs' Duty to Mitigate Damages...............1269

III.  SUMMARY & CONCLUSION .........................................1270

Plaintiffs the State of New Mexico and the State of New Mexico *ex rel.* Patricia A. Madrid assert claims for statutory and common-law public nuisance and negligence under New Mexico law arising from the hazardous chemical contamination of groundwater underlying the area referred to as the South Valley Site in Albuquerque, New Mexico. The contamination allegedly resulted from decades of the Defendants' manufacturing and industrial operations at the Site. Plaintiffs allege that the contamination has rendered a significant volume of that groundwater unavailable for appropriation to its highest and best use, *viz.,* as drinking water for human consumption, and has thus caused injury to the State's interest as trustee in making the water available for appropriation.[1] Plaintiffs filed this action seeking an award of monetary damages to compensate the State of New Mexico for the loss of use of the contaminated groundwater.

Pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"),[2] the South Valley Site was added to the National Priorities List (or "Superfund List") in 1983. *See* 48 Fed.Reg. 40,658 (September 8, 1983). The chemical contamination beneath the South Valley Site continues to be the subject of several ongoing remedial actions, some of which were ordered by the Environmental Protection Agency (EPA), others having been initiated and agreed to by the State of New Mexico's Environment Department (NMED).

Plaintiffs' claims in this action are pleaded at the periphery of these ongoing remedial actions. Plaintiffs' counsel insist that they are here not to challenge the adequacy of the ongoing remediation, but to obtain compensation for injury to the State's interest in the resource that will persist beyond the reach of the existing remedial systems.

---

**1.** Plaintiffs are not here as water users or water rights holders; they assert the State's ownership of all waters in the State of New Mexico, including all groundwater and assert that pursuant to the New Mexico Constitution and laws, the State holds that groundwater in trust for the purpose of making it available for appropriation by users who will apply it to a beneficial use. Plaintiffs also assert *parens patriae* standing to protect the State's sovereign interests together with interests which all of New Mexico's citizens hold in common in protecting public waters against pollution.

**2.** Pub.L. 96–510, 94 Stat. 2767, *codified at* 42 U.S.C. §§ 9601 *et seq.* (2000).

## I. IDENTIFYING TRIABLE ISSUES

From its beginning in 1999, this has proven to be a case of description and definition.

Through an extended Pretrial Conference, the court has sought to define the interest of the State of New Mexico at stake in this litigation, the injury to that interest that Plaintiffs intend to prove, the nature and scope of the Plaintiffs' liability theories, and the appropriate measure of the legal remedy for that alleged injury— all in an effort to identify and define the issues in this case, if any, that need to be decided at the first "injury and damages" phase of the trial in this action.[3]

On May 11 and 12, 2004, this case came before the court for the purpose of a Final Pretrial Conference. The court had set the matter down to gain the assistance of counsel in defining what triable issues remain in light of this court's Memorandum Opinion & Order, filed April 6, 2004 (dkt. no. 1067) ("April 6th Order"), and Findings and Order re: Expert Witnesses, filed May 7, 2004 (dkt. no. 1072) ("May 7th Order").

In the April 6th Order, the court undertook to (1) identify the Plaintiffs' legally protected interests at stake in this action; (2) define the alleged injury to those interests as to which a triable issue may exist; (3) delineate the scope of Plaintiffs' remaining state law claims in light of interest and injury; (4) determine the proper measure of damages based upon the nature of the injury asserted; and (5) set forth, provisionally at least, the genuine issues of fact that may remain for the first "injury and damages" phase of trial. In the May 7th Order, the court ruled upon the admissibility of expert testimony proffered by the parties at the Rule 702 hearing held in December 2003 and January 2004. The court excluded the proffered testimony of Plaintiffs' expert Dr. David S. Brookshire, and much of the proffered testimony of Dr. Dennis E. Williams and Mr. Stephen B. Johnson for lack of relevance and "fit" to the fact issues that may remain for trial.

### A. Interest, Injury, Liability & Damages

The State's legally protected interest at stake in this action is the State's interest as the *trustee* of the public's groundwater. Under New Mexico's Constitution and laws, the State owns the groundwater resource, holding it not for itself, but for the use and benefit of the public. (April 6th Order at 22–26 & nn. 25–29; State of New Mexico's Complaint in the Consolidated Case, filed July 31, 2001 (dkt. no. 367) ("Consolidated Complaint"), at 5 ¶ 13.[4]) "The State serves as the watermaster, the gatekeeper, the overseer of the process of appropriation for beneficial use." (April 6th Order at 24.) Here,

> The State is seeking reparations and compensation for that which it owns and

---

**3.** Additionally, on December 9–12, 2003 and January 7–8, 2004, the court held an evidentiary hearing under Fed.R.Evid. 702 and in the context of the Pretrial Conference, examining the admissibility of the parties' proffered expert testimony on the issues of injury and damages. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Dodge v. Cotter Corp.,* 328 F.3d 1212 (10th Cir.2003), cert.

*denied,* —— U.S. ——, 124 S.Ct. 533, 157 L.Ed.2d 408 (2003); *see also* Fed.R.Evid. 401–403.

**4.** *See Snow v. Abalos,* 18 N.M. 681, 140 P. 1044, 1048 (1914) ("The water in the public stream belongs to the public. The appropriator does not acquire a right to specific water flowing in the stream, but only the right to take therefrom a given quantity of water, for a specified purpose.")

which it holds in trust as a trustee on behalf of the public.... [T]he State of New Mexico, as trustee, acts in the interest of the citizens and all the water rights holders to protect the water available for the water-right holders to appropriate.

(Transcript of Hearing, dated August 6, 2003 ("Tr.8/6/2003"), at 1978:19–22, 1980:14–18 (Mr. Sher).)

The injury to that interest consistently asserted by Plaintiffs is the *loss of use* of groundwater resulting from chemical contamination traceable to the Defendants: "The STATE OF NEW MEXICO has been prevented from allowing its citizens the benefit of this natural resource" because the "contamination of this aquifer by Defendants has resulted in a loss of useable drinking water in the City [of Albuquerque] and STATE OF NEW MEXICO,

[and] the reduction of available water for fire fighting, commercial, industrial and other uses to which the community customarily puts water ...." (Consolidated Complaint at 14 ¶ 44, 15 ¶ 47.[5]) In particular, Plaintiffs claim that contamination has rendered *in situ* groundwater beneath the South Valley Site unusable as "drought reserve," as water to be kept as "stock" or "storage" to be made available for future appropriation in case of severe drought.[6] (*See* April 6th Order at 30–64; Transcript of Hearing, dated February 4, 2003, at 1669:2–1672:15 (Mr. Lewis).[7]

As to theories of liability, the Plaintiffs' remaining claims arise under the New Mexico law of public nuisance and negligence, but the scope of those claims must of necessity be defined in terms of federal law.[8]

---

**5.** (*See* Tr. 8/6/2003 at 1970:24–1984:20 ("If the State permits appropriation, then someone can appropriate it. But, unfortunately, because of the contamination in this case, it cannot be appropriated.... The State cannot risk letting someone appropriate that water.") (Mr. Sher).)

**6.** *See also* Proposed Joint Pre–Trial Order, received July 29, 2003, at LI–28 ("'As distinct from the annual flow of sustained yield, the highest value of the remaining stock of groundwater is as insurance against potential future extended drought conditions, i.e., its in situ services.'" (quoting Dr. Tomasi)).

**7.** The court held that Plaintiffs failed to come forward with specific facts showing a past, present or future loss or reduction of "safe yield"—the volume of groundwater that may normally be extracted for use from the Middle Rio Grande Basin aquifer, including that underlying the South Valley, without reducing the aquifer's volume—because of the contamination. (April 6th Order at 46–51, 63–64.) For one thing, Plaintiffs concede that water in the Middle Rio Grande Basin is already fully appropriated, leaving no quantity of groundwater available for further appropriation regardless of contamination at South Valley. Moreover, uncontroverted facts in the record reflect that the total volume of groundwater

used by the City of Albuquerque has not been discernably diminished as a consequence of the contamination at South Valley. (*See* May 7th Order at 65–69; Motion and Memorandum for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed July 10, 2002 (dkt. no. 612), at 2 (Albuquerque "has not sustained any loss, deprivation, or diminution of its water rights as a result of the alleged contamination in the South Valley area, and ... the City has continuously satisfied all past and current demands for water services through the unimpaired use of its water rights.").)

**8.** Initially, the Plaintiffs pleaded claims against the Defendants under both CERCLA and New Mexico tort law. (*See* Consolidated Complaint, *passim*.) Early in the Pretrial Conference, however, Plaintiffs' counsel elected to voluntarily dismiss the CERCLA claims as against all defendants, and on November 20, 2002, based upon a stipulation by counsel for all parties, this court entered an order dismissing Plaintiffs' CERCLA claims and the federal defendants from the action, all with prejudice. (Stipulation and Order of Dismissal, filed November 20, 2002 (dkt. no. 909).)

First, because Plaintiffs have pleaded them that way.

Further, because in any event, a private defendant may *not* be held liable under state law for complying with an EPA order requiring remedial action, based upon Plaintiffs' claim that by the projected time of its completion the EPA remedy itself will somehow prove to be inadequate to the task at hand.

As outlined in the court's earlier opinion, Plaintiffs' operative pleading in this case states that they seek to "recover **monetary damages** for injuries incurred by the STATE OF NEW MEXICO" to "the extent that the damages alleged herein are either *not available under Section 9607(f)* of the CERCLA and/or to the extent that CERCLA does not provide adequate remedies to fully compensate the STATE OF NEW MEXICO for Defendants' pollution and contamination" at the South Valley Site. (Consolidated Complaint at 3 ¶¶ 4, 5 (emphasis in original).)

> In other words, the Complaint also seeks to recover damages to the extent that damages suffered by the STATE OF NEW MEXICO are not provided for and/or are otherwise not recoverable pursuant to CERCLA, such as those damages resulting from releases that have occurred wholly before December 11, 1980, those damages resulting from releases of substances exempted under the CERCLA petroleum exclusion, and those damages incurred in excess of the damage limitation as provided by 42 U.S.C. § 9607(c).

(*Id.* at 3 ¶ 4.) Plaintiffs' explicitly plead that "this Complaint is not intended to and does not seek to impose any remediation or clean up requirements·directed by any state or federal environmental agency, *nor does this Complaint seek to collaterally attack any ongoing or past regulatory compliance activities.*" (*Id.* at ¶ 5 (emphasis added).)

And what does this mean?

Earlier in the Pretrial Conference, Plaintiffs' counsel explained that "[t]he remedy to the State . . . under the common laws is that they are entitled to damages that are residual at the end of the currently operated remediation system." (Transcript of Hearing, dated November 18, 2002, at 907:22–25 (Mr. Stephen Terrell).[9]) More recently, counsel explained it this way:

> And what our claim is—we have now over a decade of remedial action that we can . . . present to the jury and say 'This is literally a box that GE and the EPA is willing to remediate. And there is contamination outside of that that we would like to address.' . . .
>
> We will ask the jury, *predict what the likely . . . remediation will be.* And what's left over? That's what the State of New Mexico can recover damages for or . . . remediation costs for.

(Transcript of Hearing, dated May 12, 2004 ("Tr.5/12/2004"), at 4379:5–17 (Mr. Stephen Terrell) (emphasis added).[10]) Plaintiffs thus seek damages not recoverable under CERCLA for groundwater con-

---

9. (*Accord* Transcript of Hearing, dated October 3, 2002, at 738:23–25 ("this is a case for after cleanup, what is left . . . the residue. . . .") (Mr. Lewis); Transcript of Hearing, dated February 5, 2003, at 1930:20–24 ("at the end of the remediation that's been prescribed by the EPA, the injury will remain in that area. . . . There is residue.") (Mr. Lewis).)

10. (*See also* Transcript of Hearing, dated October 3, 2002, at 740:14–18 ("I think as long as they don't change what they're planning to do, the only evidence disputed as it is, that you and I and the rest of the people in this courtroom need to deal with, is what is the certainty of the level of cleanup that they would achieve at a particular level.") (Mr. Lewis).)

tamination "outside" the "box that GE and the EPA [are] willing to remediate"—that is, the "box" defined by the intended scope of the existing EPA-ordered remediation.

Plaintiffs' counsel—not the court—defined and limited the State's remaining claims in this fashion.

In seeking non-CERCLA damages now for what may yet be "residual" some years in the future, Plaintiffs have confined themselves to proving an "injury" shown by (1) the persistence of contamination beyond the reach of CERCLA or beyond the intended scope of the existing EPA remediation that (2) is nonetheless attributable to discharge or release by one or more of the remaining defendants, and (3) for which New Mexico law provides a remedy beyond the relief available under CERCLA.

And as explained below, to avoid summary judgment, Plaintiffs must at this point make that showing through sworn averments of specific evidentiary facts.

■ To recover damages in light of the court's April 6th Order, "the Plaintiffs must prove an actual injury to the State's legally protected interests in the groundwater ... as well as prove facts supporting an award of compensatory damages." (April 6th Order at 136–37.) Concerning the measure of damages, this court deter-

mined that in the absence of specific facts showing that the Plaintiffs' alleged "loss of use" injury is *total* and *permanent*, the proper measure of damages for injury to the *in situ* groundwater beneath the South Valley Site caused by the chemical contamination is the cost of restoration of the contaminated water to use as drinking water consistent with New Mexico drinking water standards. (April 6th Order at 132–35.[11])

## B. The Court's Tentative Statement of Triable Issues

The scope of Plaintiffs' claims having been defined at least to that extent, the court formulated a tentative statement of triable issues:

1. What is the nature, location and extent (in both volume and concentration) of the chemical contamination of the groundwater underlying the South Valley Site that exists beyond the reach of CERCLA (*e.g.*, petroleum hydrocarbons only) and/or outside the intended scope of the existing EPA remediation?

2. What is the volume of *in situ* groundwater beneath the South Valley Site that has been injured and rendered unavailable (*e.g.*, as drought reserve) for use as drinking water because of that chemical contamination?

---

11. In fashioning a remedy for Plaintiffs' "injury" based on the alleged loss of future use, the court chose a measure of damages—cost of restoration to use as drinking water—that fit the injury as alleged, ultimately eliminating the injury altogether. (*See* April 6th Order at 118–35, 140–41.) In the court's view, a plaintiff "should be permitted to recover full restoration costs and all consequential damages that are properly established, *at least if he can give the court assurance that repair, restoration or cleanup will actually take place.*" 1 Dan B. Dobbs, *Law of Remedies* § 5.2(5), at 725 (emphasis added).

" 'The methodology a district court uses in calculating a damage award, such as deter-

mining the proper elements of the award or the proper scope of recovery is a question of law.' " *Eateries, Inc. v. J.R. Simplot Company*, 346 F.3d 1225 (10th Cir.2003) (quoting *Southern Colorado MRI, Ltd. v. Med–Alliance, Inc.*, 166 F.3d 1094, 1100 (10th Cir.1999)); *Oscar Gruss and Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir.2003) (" 'although the amount of recoverable damages also is a question of fact, the measure of damages upon which the factual computation is based is a question of law' ") (quoting *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991)); *N. Maltese and Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir.1985).

3. What is the cost of restoration of that volume of contaminated groundwater that has been lost to use as drinking water?

4. What amount of damages will reasonably compensate the State of New Mexico for the injury to its interest in that volume of *in situ* groundwater, measured by the cost of restoration, response costs, etc.?

(April 6th Order at 139–140.) These statements were to some extent hypothetical, and *assumed* the existence of specific facts showing injury and damages within their scope.[12] Moreover, the April 6th Order did *not* undertake to delineate "the intended scope of the existing EPA remediation"—a definition essential to determining the ultimate scope of Plaintiffs' remaining claims. Even so, as incorporated in a proposed Pretrial Order prepared by the court,[13] these issue statements provided a framework for the colloquy between court and counsel at the May 11–12 Pretrial Conference.

## C. The Defendants' Motions for Summary Judgment

Relying on pending and renewed motions for summary judgment, the Defendants asserted that no triable issues remain as to the essential elements of injury and damages, and that each Defendant is entitled to summary judgment on all of Plaintiffs' remaining state tort claims.

### 1. General Electric

In General Electric Company's Supplemental Brief is Support of its Motion for Summary Judgment on Plaintiffs' Damages Claims in Light of the Court's April 5, 2004 Order, filed April 23, 2004 (dkt. no. 1068) ("GE 4/23/2004 Br."),[14] GE contends that Plaintiffs' claims should be dismissed in their entirety because, as against GE, (1) Plaintiffs cannot prove an injury beyond the reach of CERCLA;[15] and (2)

---

**12.** The injury asserted by the Plaintiffs—loss of use of *in situ* groundwater as "drought reserve"—appears largely hypothetical because to date, at least, no occasion has arisen in which water users (primarily the City of Albuquerque) would have extracted the affected South Valley groundwater in response to a severe drought, but for the presence of the chemical contamination.

Moreover, ACF Industries suggests that the State's interest in *in situ* groundwater at South Valley treated as "drought reserve" is "identical to the State's interest in any loss of safe yield" at South Valley, and that the same legal and administrative constraints would apply to future extraction of that water. (Transcript of Hearing, dated May 11, 2004 A.M. Session, at 4163:1–7 (Ms. Azorsky).) South Valley being "within a mile of the river," it "is not an area for an appropriate drought reserve" because of the impact that increased pumping may have in depleting Rio Grande stream flow. (*Id.* at 4163:8–4164:7.) Pumping of additional groundwater at South Valley thus seems unlikely even in the case of more severe drought conditions.

The April 6th Order noted "Plaintiffs' failure of proof of the essential elements of injury and damage—a failure to 'set forth specific facts showing that there is a genuine issue for trial,'" but refrained from granting summary judgment, awaiting further delineation of the Plaintiffs' alleged injury in the context of the court's issue statements and the proper measure of damages. (April 6th Order at 137–141.) In doing so, the court *assumed* the existence of specific facts sufficient to raise a triable issue as to the injury alleged by the Plaintiffs, the loss of use of *in situ* groundwater as "drought reserve" within the scope of their pleaded claims.

**13.** (*See* Proposed Pretrial Order (Phase I—Interest, Injury and Damages), dated May 7, 2004, at [5]-[6].)

**14.** (*See* Defendant General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' Damages Claims, filed July 10, 2002 (dkt. no. 631).)

**15.** CERCLA permits recovery of damages for releases of "hazardous substances," which is defined to *exclude* certain types of petroleum contamination. *See* 42 U.S.C. § 9601(14) (2000). However, Plaintiffs have expressly disavowed any claim against GE for dis-

Plaintiffs cannot establish any injury beyond the intended scope of the existing Plant 83/General Electric remediation. Under the EPA's Record of Decision (ROD), that remedy is intended to address *all* contamination at or originating from the Plant 83 site, and, GE submits, the remedy is intended to be self-adjusting, adapting its treatment system to resolve any persistent contamination detected by its monitoring program, and leaving no residual contamination "injury" to be redressed by Plaintiffs' state tort remedies. If the intended scope of the existing remediation is defined in this fashion, GE argues, Plaintiffs cannot defeat summary judgment; they have not come forward with significant probative evidence showing the existence of a volume of groundwater exceeding New Mexico drinking water standards that lies beyond that remedy's reach.

### 2. ACF Industries

ACF Industries asserts that Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact concerning the essential "injury" element of their remaining state law claims: "there is no groundwater contamination attributable to ACF Industries ... that exists beyond the reach of CERCLA ... and/or outside the intended scope of the existing EPA remediation." (ACF Industries, Inc.'s Supplemental Brief in Support of Summary Judgment Following Order Dated April 5, 2004, filed April 27, 2004 (dkt. no. 1071) ("ACF 4/27/2004 Br."), at 2–3.[16]) ACF concurs with GE's view that the existing EPA remedy "is intended to remediate all contamination in the deep zone aquifer allegedly attributable to Plant 83," (*id.* at 8), and that the system's monitoring component will trigger such additional action or adjustment of the system as may be needed to remediate *all* of that contamination. (*Id.* at 7–8.) There being no triable issue concerning the "injury" element of Plaintiffs' claims, all other factual disputes become immaterial, says ACF, and do not prevent the grant of summary judgment in ACF's favor.

### 3. The Chevron & Texaco Defendants

The Chevron/Texaco Defendants[17] renew their motion for summary judgment based on the Hydrocarbon Remediation Agreements ("HRAs") between these defendants and the New Mexico Environment Department in light of the court's April 6th Order. (Chevron and Texaco Defendants' Renewed Motion for Summary Judgment Based on the Hydrocarbon Remediation Agreements, filed April 23, 2004 (dkt. no. 1069).) Plaintiffs' damages remedy in this case having been limited to restoration costs, the Chevron/Texaco Defendants contend that "the costs of

---

charge of petroleum or other contaminants that do not qualify as "hazardous substances" under CERCLA:

> *GE REQUEST FOR ADMISSION NO. 2:*
> In this ACTION, plaintiffs seek to recover damages from General Electric Company for one or more RELEASES of substances that are not HAZARDOUS SUBSTANCES.
> *PLAINTIFFS' RESPONSE:*
> Denied.

(Exhibit A to GE 4/23/2004 Br.) Plaintiffs also have denied that their claims against GE fall within any other exclusion to CERCLA liability. (*Id.*)

16. (*See* Motion and Memorandum [by ACF Industries, Chevron, and Texaco] for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed July 10, 2002 (dkt. no. 612); ACF Industries, Inc.'s Motion for Partial Summary Judgment Limiting Damages to Those for Any Loss of Drinking Water Services and Brief in Support of the Motion, filed July 10, 2002 (dkt. no. 598).)

17. Defendants Chevron U.S.A. Inc., Chevron Pipe Line Company, Texaco Inc., and Texaco Refining and Marketing.

restoration already have been imposed on Chevron and Texaco pursuant to the HRAs," that the additional damages sought in this case "fall within the four corners of the HRAs," and that "the HRAs bar Plaintiffs' further recovery." (*Id.* at 4.) They argue that (1) the New Mexico Environment Department (NMED) has primary jurisdiction over abatement and restoration, including civil actions in the nature of an abatement, and that NMED exercised that jurisdiction in making the Hydrocarbon Remediation Agreements (HRAs); (2) the State is already recovering the cost of restoration from the Chevron/Texaco Defendants, who are paying for the ongoing Chevron HRA and Texaco HRA remedial actions; (3) the State's claims for cost of restoration damages fall within the scope of NMED's waiver under the HRAs; and (4) if problems exist beyond the reach of the existing systems, the State of New Mexico has failed to mitigate damages because the State has not exercised its power to amend the scope of work pursuant to the HRAs: "To the extent that there is any need for additional remediation, the HRA's grant NMED the authority to amend the Statements of Work" and expand the remedial actions as needed to resolve the problem. (*Id.* at 5 (citing the Chevron HRA ¶ 56 and Texaco HRA ¶ 51).[18])

### 4. Plaintiffs' Response

As to GE and ACF, Counsel for the Plaintiffs respond that (1) under the EPA's Record of Decision (ROD), the groundwater contamination attributable to GE and ACF Industries at Plant 83 should be cleaned up to a level satisfying New Mexico Water Quality Control Commission standards for abatement of groundwater

contamination rather than the EPA's Maximum Contaminant Level (MCL) standards adopted by the State of New Mexico for delivery of drinking water through public systems; (2) "the sampling data irrefutably demonstrates the existence of a contaminant plume or plumes 800–1,000 feet below ground surface and 400–500 feet outside of the intended scope of the existing EPA remediation"; (3) CERCLA allows the State to recover state law damages measured by additional restoration costs as a remedy complementary to the existing EPA remedial action at the South Valley Site; and (4) Plaintiffs have proffered expert opinion evidence concerning the feasibility and estimated cost of "remediating and restoring the groundwater at South Valley." (The State of New Mexico's Response to Supplemental Briefs in Support of Summary Judgment, Following April 5, 2004 Court Order, Filed by Defendants ACF Industries and General Electric, filed May 10, 2004 (dkt. no. 1074) ("Pltfs' Resp. (GE/ACF)"), at 1–5, 7, 8, 9–10.)

Indeed, for the first time in this continuing Pretrial Conference, Plaintiffs' counsel acknowledge that "it is technically feasible to design a remediation system to address the contaminant plumes that [Plaintiffs contend] are beyond the intended scope of the existing EPA remediation." (*Id.* at 9–10.)

In response to the Chevron and Texaco Defendants, the Plaintiffs argue that (1) these defendants have failed to carry their burden under Fed.R.Civ.P. 56 to submit undisputed material facts negating Plaintiffs' damages claim; (2) there exist genuine issues of material fact concerning the Hydrocarbon Remediation Agreements

---

**18.** At the May 11, 2004 Pretrial Conference, the Chevron/Texaco Defendants also urged the entry of summary judgment on the ground that Plaintiffs had no admissible evidence to support their damage claim in light of the court's May 7th Order excluding Plaintiffs' expert damages opinions as irrelevant. (*See* Transcript of Hearing, dated May 11, 2004 A.M. Session, at 4164:21–4165:1 (Ms. Wood).)

(HRAs) that "must be tried before the jury"; (3) both the Chevron HRA and Texaco HRA release liability only as to "'those actions that might be brought by NMED,'" and do not "'limit the authority of any other state agency, including the Office of the Natural Resource Trustee'" to bring "'any claims the state may have for natural resource damages under state or federal law, including the cost of preparing a damage assessment'"; and (4) NMED's primary jurisdiction over environmental abatement and restoration does not extend to "claims for damages on behalf of the State of New Mexico" even where recovery is to be measured in terms of restoration costs. (Plaintiffs' Response to the Chevron and Texaco Defendants' Renewed Motion for Summary Judgment Based on the Hydrocarbon Remediation Agreements, filed May 10, 2004 (dkt. no. 1073) ("Pltfs' Resp. (Chev/Tex)"), at 3, 4, 7 (quoting the Chevron HRA ¶¶ 16, 54 & the Texaco HRA ¶¶ 15, 49).)

### D. The Bone of Contention at Plant 83: *Static vs. Dynamic Remedial Systems*

The core of the controversy now before this court is the fundamental disagreement between the Plaintiffs' and the Defendants' definition of the "intended scope of the existing EPA remediation."

Plaintiffs' counsel insist that the intended scope of the existing EPA remediation is static, that is, the scope is defined by the

actual operation of the Plant 83/General Electric treatment system as it exists today, coupled with the assumption that there will be *no* future expansion of the system beyond its existing scope, regardless of any additional data or the explicit terms of the ROD.[19] "[O]ur damage model was based on the fact the defendants say, [']We're not going to do anything different than we're doing right now, and we're only going to do such and such.[']" (Transcript of Hearing, dated October 3, 2002 ("Tr.10/3/2002"), at 738:9–12 (Mr. Lewis).)

If current operations indeed define the intended scope of the remediation—in counsel's terms, the "box that GE and EPA are willing to remediate"—then the existing system "does not remediate contaminants outside the capture radius of its extraction wells, which leaves a significant amount of the total contaminant plume unremediated,"[20] and leaves room in this litigation for a state tort damages remedy. (*See* Transcript of Hearing, dated May 11, 2004 A.M. Session ("Tr. 5/11/2004 AM"), at 4160:3–5 ("there will obviously be an issue on the volume of contamination that lies outside of the GE remediation system") (Mr. Lewis).) According to Plaintiffs, their expert "Dr. Dennis Williams verified that groundwater sampling and groundwater modeling had confirmed the existence of contamination in excess of MCL drinking water standards outside of the intended scope of the existing EPA remediation." (Pltfs' Resp. (GE/ACF) at 5.[21])

19. This assumption reflects no small amount of cynicism concerning a federal administrative process in which the State of New Mexico—through NMED, at least—has long been an active and cooperative participant.

20. (Declaration of Dr. Dennis E. Williams, dated August 30, 2002, Exhibit 1 to the State of New Mexico's Response and Memorandum in Opposition to Phillips Pipe Line Co., et al.'s Motion and Memorandum for Partial Summary Judgement Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under

CERCLA and Lost Use Claims at Common Law, filed September 16, 2002 (dkt. no. 769), at 7 ¶ 20.)

21. However, Dr. Williams' existing contaminant plume volume estimates have been excluded from trial because, *inter alia*, he included contamination known to be attributable to non-party sources, *e.g.*, the Univar Edmunds Street facility, for which these Defendants cannot be held liable. (*See* May 7th Order at 31–35, 38–39, 50–51.)

Plaintiffs insist that they are not challenging the EPA remedy because they seek damages only for the volume of contaminated groundwater that may be found beyond the reach of the current design and operation of the General Electric/Plant 83 system:

> So it is our contention that we have plume out there that, for lack of a better word, colloquially speaking, ain't being remediated. We're not blasting what they're doing where they're doing it. We're blasting what they ain't doing where they ain't doing it.
>
> .    .    .    .    .
>
> [T]his woefully inadequate remediation program—it's great for what it's doing. It's just not doing everything that's out there. And the EPA has shown no inclination. And we're sort of in the position of saying, "Okay, we're seeking damages for what they're not doing out here." That's where our damage model really comes from.

(Tr. 5/12/2004, at 4346:6–11, 4346:18–4347:1 (Mr. Gallagher).)

GE and ACF Industries respond that the existing remediation is dynamic and self-adjusting, and that it encompasses *all* contamination originating at Plant 83 within its intended scope.

The Record of Decision for the General Electric/Plant 83 remedial action describes a comprehensive remedy for groundwater contamination originating from the Plant 83 facility, including both (1) "the extraction of contaminated groundwater and treatment with air stripping followed by carbon absorption" and reinjection of the water into the aquifer, and (2) "the monitoring of the area groundwater both during and after completion of the remediation to ensure the effectiveness of the selected remedy."[22] The Record of Decision indicates that the EPA's selected remedy, together with the Records of Decision for the Site's five other operable units, is intended to address *all* contamination at or emanating from the Plant 83 site:

> The intent of the combined activities of EPA in the South Valley Superfund site area is to provide protection for all of those who are affected by contamination in the aquifer originating from this site. The effort to eliminate contaminant sources, limit further migration from one groundwater zone to another, to recover and treat contaminated groundwater and to provide for a substitute source of drinking water for the lost City of Albuquerque water well provides such protection both short and long-term.
>
> Each of the operable units of the South Valley site is part of a greater whole. . . . EPA believes that all concerns about contamination will be addressed through the combination of the remedies selected in the Records of Decision for the South Valley site.[23]

22. (United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), at 16, Exhibit B to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.; Declaration for the Record of Decision, Former Air Force Plant 83 Operable Unit, Exhibit E to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.)

23. (United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), Responsiveness Summary (Attachment 3), Responses to Comments 21–22, Exhibit C to GE 4/23/2004 Br; *see also* Geoscience Consultants, Ltd., Final Work Plan for the Former Air Force Plant 83/General Electric Operable Unit, South Valley Superfund Site (July 20, 1990), at 34, Exhibit C to ACF 4/27/2004 Br. ("[T]he choice of extraction system will be based on selecting the system that will capture all the CERCLA-actionable contamination most effectively.").)

As the agency explained, "Contaminants that can reasonably be associated with the Superfund site will be addressed," ongoing "[g]roundwater monitoring will ensure that the combination of remedies is effective, protective of public health, and the environment," [24] and "[w]ater extraction will continue until the levels of contaminants in the water fall below State and Federal regulatory standards." [25]

Defendants insist that the EPA remedy is not static, but instead has been structured to proceed in a fashion that will "follow the plume" of Plant 83 contaminants, wherever it may be.[26] The key is the monitoring program:

> The monitoring program is made up of data collection from numerous wells and sampling points, including the sentinel wells in the deep zone of the aquifer below 4,600 feet above mean sea level and to the east of Interstate 25. All of this monitoring is part of the remediation. General Electric, EPA and the New Mexico Environment Department continue to monitor these wells to ensure that the contamination exceeding drinking water standards allegedly attributable to Plant 83 does not escape to or beyond these points. This comprehensive monitoring, in addition to the functioning groundwater treatment system, comprises the intended scope of the existing remediation. . . .

(ACF 4/27/2004 Br. at 6–7 (footnote & citation omitted).) The groundwater monitoring program is not constrained by the ROD's initially designated "areas of potential contamination," which the ROD explains "are not intended to limit the areas in which additional groundwater sampling may be necessary." [27]

In addition to continuous groundwater monitoring, the Record of Decision expressly provides for ongoing administrative review of the implemented remedial actions to ensure that they are consistent with EPA's intent to address all contamination associated with the South Valley. In addition to monthly progress reports, semiannual monitoring reports, and annual reports, "[t]he remedial action will be reviewed every five years after its initiation to assure that human health and the environment are being protected by the remedial action being implemented." [28] The five-year review is a

> comprehensive look at all of the site activities from the past five years to ensure that what's occurring at the site is still protective of human health and the environment. So it's a matter of looking at all of the data and making

---

**24.** (United States Environmental Protection Agency, Record of Decision: San Jose 6 (SJ–6) Operable Unit, South Valley (September 1988) Responsiveness Summary, Response to Comments 70 & 71, Exhibit D to GE 4/23/2004 Br.)

**25.** (United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), at 16, Exhibit B to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.)

**26.** In this regard, the EPA remedy simply tracks the reach of CERCLA itself, which extends cleanup to contaminants emanating from a site, wherever they may migrate. *See*

42 U.S.C. § 9601(9) (defining "facility" as "any site or area where a hazardous substance has ... come to be located"); *United States v. City and County of Denver*, 100 F.3d 1509, 1511 (10th Cir.1996) (CERCLA reach extends to "any place where hazardous substances are located").

**27.** (Declaration for the Record of Decision, Former Air Force Plant 83 Operable Unit, Exhibit E to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.)

**28.** Declaration for the Record of Decision, Former Air Force Plant 83 Operable Unit, Exhibit E to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.

sure or ensuring that whatever actions are ongoing are meeting the actual goals of the ROD.

(Deposition of Greg Lyssy, dated April 24, 2002 ("Lyssy Dep."), at 13:25–14:6, Ex. F to GE 4/23/2004 Br & Exhibit G to ACF 4/27/2004 Br.) In the event the remedial action is not effective in meeting the goals of the ROD in protecting human health and the environment, "the EPA in conjunction with NMED would take the appropriate action to ensure that they are safe." (*Id.* at 14:18–19.)

The State of New Mexico continues to be directly involved in this ongoing review process:

Q. Now, you said in conjunction with NMED. What role does NMED play at the site?

A. NMED is my support agency. Whenever we get any of these reports or have meetings with the various PRPs at the site or even the City of Albuquerque or Bernalillo County, EPA and NMED will meet together with those entities. If the reports have been received by EPA and NMED, NMED will provide their comments to EPA. EPA will incorporate those comments into the overall comment letter going back out to the PRPs.

Q. So is NMED routinely given an opportunity to comment on technical reports—

A. They always are.

(*Id.* at 14:20–15:7.)

Uncontroverted facts in this record reflect that the Plant 83/General Electric system has already been expanded to take into account additional contamination evidenced by sample data from more recently installed monitoring wells. In early 2000, "the groundwater monitoring program detected contamination in a newly installed well (P83–22–D2) that was installed in response to a detection in a Westbay well." (ACF 4/27/2004 Br. at 7 (citing Lyssy Dep.

at 43:21–44:1, Ex. F to GE 4/23/2004 Br & Exhibit G to ACF 4/27/2004 Br.).) This demonstrated to EPA that "the monitoring system is effective in showing that if there are any concentrations, they are picked up and detected. And once we have the detections, we take the appropriate steps to deal with them." (Lyssy Dep. at 44:7–12.) Accordingly, in 2003, GE expanded its existing remedial system by installing a new extraction well, two new injection wells, and an additional monitoring well, all approved by EPA and NMED. (*See* W.E.S., Inc., 2002–2003 Annual Report And Semi–Annual Quality Assurance Report, Deep Zone Groundwater Remediation System, Former Air Force Plant 83/General Electric Operable Unit, South Valley Superfund Site (August 15, 2003), § 4.5, at 18–21, Exhibit I to ACF 4/27/2004 Br.)

Plaintiffs acknowledge these facts, but persist in their assertion that groundwater beneath South Valley has been lost to use as drinking water because of contamination beyond the reach of the existing remedy.

### E. Plaintiffs' "Deep, Deep" Contaminant Plume

Concerning what lies beyond the intended scope of the existing EPA remediation as Plaintiffs would define it, counsel asserted that sampling data "irrefutably demonstrates the existence of a contaminant plume or plumes 800–1,000 feet below ground surface and 400–500 feet outside of the intended scope of the existing EPA remediation," (Pltfs' Resp. (GE/ACF) at 7), what Plaintiffs' counsel calls "the deep-deep aquifer contamination." (Tr. 5/11/2004 AM, at 4158:21 (Mr. Lewis).) As evidentiary support for this, Plaintiffs rely on the intended testimony of their expert, Dr. Dennis E. Williams, who proffered testimony at the December 9th evidentiary hearing that there were "deep hits that are

below the depth of the deepest GE extraction well," (Transcript of Hearing, dated December 9, 2003 ("Tr.12/9/2003"), at 2650:11–12), and that "the deep zone [remediation system] doesn't go much below 4,600 feet, [and] there's some known contamination quite a bit deeper," (*id.* at 2542:17–19), as reflected in data gathered in connection with the EPA-ordered remediation. (*See id.* at 2465:24–2466:22, 2467:3–2470:2, 2491:18–2492:1, 2493:10–2494:25, 2531:21–2541:10, 2542:12–2548:22.) Plaintiffs also point to a GE memorandum and letter indicating in 1993 that the City of Albuquerque's municipal San Jose 6 Well had served as a " 'vertical conduit for downward contaminant migration,' " and another 1993 memorandum suggesting " 'that there exists a plume that lies significantly below the bottom of our main plume, at least in the vicinity of SJ–6 and WB–4.' " (Pltfs' Resp. (GE/ACF) at 6–7 & Exhs. G, H & I; *see also* State of New Mexico's Response and Memorandum in Opposition to ACF Industries, Inc.'s Motion for Partial Summary Judgment Limiting Damages to Those for Any Loss of Drinking Water Services and Brief in Support of the Motion, filed September 12, 2002 (dkt. no. 756), at 2–13 ¶¶ 4–22.)

## II. TRIABLE ISSUES & FED. R. CIV. P. 56

### A. Standards Governing Summary Judgment

▮ Rule 56(c) permits the entry of summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[29] The initial burden of production imposed by Rule 56(c) requires the moving party to make a prima facie showing that it is entitled to summary judgment; "if the movant makes out a prima facie case that would entitle him to a judgment as a matter of law if uncontroverted at trial, summary judgment will be granted unless the opposing party offers some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact." 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice And Procedure* § 2727, at 486 (3d ed.1998).

Where the *nonmoving* party bears the burden of persuasion at trial on the claim or issue addressed by the motion, *Celotex* instructs that the moving party may meet its initial burden "by 'showing'—that is, pointing out to the district court—that *there is an absence of evidence* to support the nonmoving party's case." 477 U.S. at 325, 106 S.Ct. 2548 (emphasis added). "[W]e find no express or implied requirement in Rule 56 that the moving party

---

**29.** The moving party's burden under Rule 56 has been described as two-fold:

This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party.... The court need not decide whether the moving party has satisfied his ultimate burden of persuasion unless and until the court finds the moving party has discharged its initial burden of production. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); 1963 Advisory Committee's Notes on Fed. Rule Civ. Proc. 56(e), ... *Celotex,* 477 U.S. at 330–31, 106 S.Ct. 2548 (Brennan, J., dissenting).

support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. 2548 (emphasis in original). As the Court explained in *Celotex:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. 2548. *Accord Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir.2000).

> In our circuit, the moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment. Once this burden is met, Rule 56(e) requires the non-moving party to set forth specific facts showing there is a genuine issue for trial.... [T]he moving party ... has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law. The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial.

*Trainor v. Apollo Metal Specialities, Inc.,* 318 F.3d 976, 979 (10th Cir.2002) (citations and quotations omitted).

Once the moving party has met its initial burden, the burden shifts back to the non-moving party under Rule 56(e) to show that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991). To meet this evidentiary burden, the non-moving party must rely upon "facts specifically averred," to be shown through "affidavits or other evidence [which] 'set forth specific facts ....'" *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (*"Lujan I"*). *See Neal v. Roche,* 349 F.3d 1246, 1249 (10th Cir.2003) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue[,] that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."); *Jensen v. Kimble,* 1 F.3d 1073, 1077 (10th Cir.1993) ("To discharge its burden, the nonmoving party must 'go beyond the pleadings and by [its] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." ' " (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e))).)

█ A district court "must view the evidence in the light most favorable to the non-moving party," *Jensen v. Kimble,* 1 F.3d at 1076 (citing *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991)), but cannot *assume* for purposes of summary judgment that specific facts exist showing that there is a genuine issue for trial:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint.

*Lujan I,* 497 U.S. at 888, 110 S.Ct. 3177. Rule 56(e) provides that judgment "shall be entered" against the nonmoving party

unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial."

The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Cf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint'"), quoting *First National Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Id.* at 888–89. *Lujan I* drew a distinction between practice under Rule 56 and a Rule 12(b) motion to dismiss upon the pleadings: "The latter, unlike the former, presumes that general allegations embrace those specific facts that are necessary to support the claim. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)." Under Rule 56, "[i]t will not do to 'presume' the missing facts" because doing so

converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegations of injury; defendant contests through Rule 56[the] existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims that it is).

*Id.* at 889.

## B. Plaintiffs' Claims & "Specific Facts" Under Rule 56

In this case, the court has already declined Plaintiffs' invitation to *assume* the existence of specific facts showing that (1) the volume of groundwater affected by the contamination beneath the South Valley Site could otherwise be made available for appropriation from the Middle Rio Grande Basin aquifer, but for the presence of the contamination; (2) the volume of water affected has been lost to all beneficial uses; and (3) the loss of use is permanent—assumptions that proved critical to Plaintiffs' theory of injury and damages based upon the alleged total and permanent loss of use of the groundwater resource. (April 6th Order at 45–46.)

Now Plaintiffs ask this court to assume the existence of specific facts supporting their generalized allegation that a "deep, deep" plume of contaminants exists beneath the South Valley Site, hundreds of feet below the reach of the existing remediation system, a contaminant plume that counsel insist the EPA and General Electric do not intend to treat. (Pltfs' Resp. (GE/ACF) at 5–7.)

■ *Lujan I* notes that "[a]t the margins, there is some room for debate as to how 'specific' must be the 'specific facts' that Rule 56(e) requires in a particular case," 497 U.S. at 889, 110 S.Ct. 3177,[30] but in this Circuit,

---

30. *Lujan II* revisited the "manner and degree of evidence required at the successive stages of the litigation" to be adduced by a party who bears the burden of proof:

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," .... In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "spe-

"The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997). *National American Ins. Co. v. American Re–Insurance Co.,* 358 F.3d 736, 739 (10th Cir.2004). Thus, to meet their evidentiary burden under Rule 56(e), the Plaintiffs "must present sufficient evidence *in specific, factual form* for a jury to return a verdict in that party's favor." *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991) (emphasis added).

In this case, the Defendants have asserted that as to the Plaintiffs' remaining state tort claims, "there is a complete failure of proof on the essential element of injury."[31] In light of this court's rulings on Plaintiffs' proffered expert testimony, Defendants also assert that there is a similar failure of proof on the element of damages. (*See* GE 4/23/2004 Br. at 8–12; Tr. 5/11/2004 AM, at 4164:21–4165:1 (Ms. Wood).) Plaintiffs have failed to present sufficient evidence in specific, factual form for a jury to return a verdict in their favor as to these elements, the Defendants submit, and under Rule 56, "failure of proof of an essential element renders all other facts immaterial." *Koch v. Koch Indus., Inc.* 203 F.3d 1202, 1212 (10th Cir.2000); *see also Miller v. Pfizer, Inc.,* 356 F.3d 1326, 1335–36 (10th Cir.2004) (upholding grant of summary judgment following exclusion of expert opinion on essential element).

### C. Specific Facts & Plaintiffs' "Deep, Deep" Plume Theory

■ To obtain summary judgment, then, the Defendants are not required to produce specific facts showing that the Plaintiffs' alleged "deep, deep contaminant plume" does *not* exist. Rather, the burden is on the Plaintiffs to come forward with significant probative evidence of specific facts showing that this alleged injury *does* exist—indeed, to come forward with sufficient admissible evidence of the alleged injury to permit a reasonable jury to find in Plaintiffs' favor.

Plaintiffs point to earlier well sample data reflecting contamination at deeper levels than had originally been predicted, with Dr. Williams noting that there were "deep hits that are below the depth of the deepest GE extraction well." (Tr. 12/9/2003, at 2650:11–12). The deep contaminant "hits" reflected in this early 1987–1993 data soon dwindled to below-MCL or even "non-detect" readings, and Plaintiffs' counsel concede that no comparable data has been reported since:

THE COURT: Other than the sampling that this refers to, do you have anything other than at 1994, ... anything later than 1994?

MR. LEWIS: Above MCLs, no, because they didn't—GE refused to put down the deeper ones they're asking for. But since that date, you have got con-

cific facts," Fed. Rule Civ. Proc. 56(e), which for the purposes of the summary judgment motion will be taken as true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial".... *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

**31.** (Supplemental Memorandum in Support of Defendant General Electric Company's Motion for Summary Judgment on Plaintiffs' Damages Claims, filed December 29, 2003 (dkt. no. 1039), at 4.)

taminants that are down there. They're not above MCLs. . . .

(Tr. 5/12/2004, at 4371:14–25.)

Instead, Plaintiffs point to the recent expansion of the Plant 83/General Electric system in light of sample data from that system's monitoring wells, relying on the proffered testimony of Dr. Williams in which he affirms counsel's assertions of the pertinent facts:

Q And in an area where they were claiming, through their pluming, their contouring, that no pollution existed, they not only found pollution at and below 4,600 feet, but they found it in excess of MCL, did they not?

A They did, yes.

Q And in Westbay–4, the point where they didn't—where they said there was no pollution at 4,600 feet, they actually found it deeper—

A Yes.

Q —than the layer 6, and they found it at concentrations in excess of MCLs, did they not?

A That's right.

Q And that is an area that your model predicted had contaminants in it, even though they didn't have a monitor well there; right?

A That's correct. That's the case where the model predicted contamination, and then the well was drilled and it verified that.

Q And then they subsequently drilled an extraction well. The newest extraction well. I think it was drilled in 2002, I guess?

A It was drilled in August. The monitoring well was drilled in February of 2002.

Q And that extraction well is completed down at, what, about 4,553 feet?

A Just below the 4,600 layer, yes.

Q And it is pulling out contaminants, is it not?

A Yes.

Q Contaminants in excess of MCLs?

A Yes.

Q And we don't—as yet, GE and its consultants have not drilled any monitor wells out here, have they, deep or deeper than 23–83–22D2, to see how far that deep contamination plume goes?

A I'm not aware of any.

Q But we do know that in P83–22D2 at EW–4 they're pulling out contaminants and have pulled them out in the amounts exceeding MCLs.

A That's correct.

(Tr. 12/9/2003, at 2493:8–2494:25 (Mr. Lewis/Dr.Williams).)

In effect, then, Plaintiffs rely upon specific facts showing that the existing EPA remedial system *is* detecting further contamination and *is* addressing it by adding additional extraction and monitoring wells as support for an inference that the system is *not* detecting and *not* treating contamination, an inference that there yet exists undetected "deep, deep" contamination that the system does not and will not treat. Viewed through Plaintiffs' eyes, direct evidence of the system's remedial efficacy becomes inferential proof of its deficiency.

The expert testimony proffered by Plaintiffs discussed the *possibility* of a deeper contaminant plume, based upon the absence of a uniform geological barrier preventing the downward migration of contaminants:

Q. . . . [I]is there any site-wide low-permeability zone around 4,600 feet that would impede or prevent the downward movement of heavier contaminants such as VOCs?

A No, not in the upper Santa Fe Group.

(Tr. 12/9/2003, at 2468:7–11 (Dr. Williams).) Dr. Williams testified that the fact that current sampling data does not

show the presence of a deeper plume "doesn't mean a plume still isn't there," (*id.* at 2545:16–17), and he talked at some length about the behavior of such a plume "if" it is there. But Dr. Williams did *not* proffer an opinion concluding that the available sampling data "irrefutably demonstrates the existence of a contaminant plume or plumes 800–1,000 feet below ground surface and 400–500 feet outside of the intended scope of the existing EPA remediation" at South Valley based upon his own analysis of that data; nor did he offer any specific estimate as to the volume, concentration or location of such a plume or plumes based upon his groundwater and solute transport modeling. (*See id.* at 2531:21–2541:10, 2542:12–2548:22.) And Dr. Williams is Plaintiffs' only expert witness proffered to testify as to contaminant plume volume, content and location.

Much like Scotland's famed Loch Ness monster, the Plaintiffs' "deep, deep contaminant plume" is believed to be "down there somewhere," and has not been conclusively proven *not* to exist,[32] but its proponents have yet to come forward with significant probative admissible evidence of specific facts affirmatively demonstrating that it *does* exist. And here, at least, the proponents of the "deep, deep contaminant plume" bear the burden of proof.

Recalling that "the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues," the court has sifted the existing record in vain for a sworn averment of specific facts showing the existence of the Plaintiffs' "deep, deep contaminant plume." At this point, it remains a concept built largely upon conjecture masquerading as inference.

The State of New Mexico is not without its own investigative resources. Indeed, through NMED, the State of New Mexico remains an active participant in the oversight of the EPA's operable units at the South Valley Site. As Dr. Williams suggests, "there's a trade-off between drilling wells every one foot and trying to drill enough wells that are economically feasible and then trying to do some predictive modeling" in attempting to identify and describe contaminant plumes. (Tr. 12/9/2003, at 2546:3–6 (Dr. Williams).) In this case, however, the State of New Mexico has elected to drill no wells at all to verify the existence of the hypothesized "deep, deep contaminant plume" beyond the existing monitoring system. Instead, Plaintiffs attempt to infer the plume's existence from the lack of current data that conclusively demonstrates its *absence.*

Plaintiffs have failed to present a sworn averment of sufficient evidence in specific, factual form confirming the presence of the unremediated above-MCL or above-NMWQCC[33] contaminant plume that Plaintiffs allege, or permitting any reliable

---

**32.** Cf. "Nessie on the Net," *at* < http://www.lochness.co.uk > ("It has not been scientifically proven that a herd of plesiosaurs does not live in Loch Ness").

**33.** Plaintiffs' counsel press the water quality standards promulgated by the New Mexico Water Quality Control Commission (NMWQCC) in regulations governing the *discharge* of toxic chemicals and the *abatement* of water pollution involving toxic chemicals as the applicable standards determining the

*use* of groundwater as drinking water under New Mexico law. *See* New Mexico Administrative Code, NMAC §§ 20.6.2.3101 *et seq.* and 20.6.2.4101 *et seq.* In doing so, they insist that the explicit language in those regulations providing that "nothing herein contained shall be construed as limiting the *use* of waters containing higher ranges and concentrations" does not mean what it plainly says. NMAC §§ 20.6.2.3101(C) and 20.6.2.4101(C) (emphasis added). (*See* April 6th Order at 31–44.)

factual determination of the volume of water purportedly affected. They have proffered no recent or current well sample data from the deeper region of the aquifer beneath South Valley—the region where the "deep, deep contaminant plume" purportedly resides—from which their own expert could make a reliable estimate of the plume's current composition, volume or location.

Looking at evidence in the record and the reasonable inferences to be drawn from that evidence in the light most favorable to the Plaintiffs,[34] this court concludes that the Plaintiffs have failed to meet their burden under Rule 56(e) to come forward with "specific facts showing a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof," *National American Ins. Co. v. American Re–Insurance Co.*, 358 F.3d at 739 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir.1996)), in this case the element of injury based upon the existence of the alleged "deep, deep contaminant plume." For Dr. Williams to say that there is some "indication of deep contamination," (Tr. 12/9/2003, at 2596:23), does not present "sufficient evidence *in specific, factual form* for a jury to return a verdict in that party's favor" as to the plume's existence. *Bacchus Industries, Inc.*, 939 F.2d at 891 (emphasis added).

## D. The Intended Scope of the Existing EPA Remediation

■ Plaintiffs have also failed to raise a genuine triable issue as to their narrower, static view of the intended scope of the existing EPA remediation. While the remedial system's current operation is certainly some evidence of intended scope, defining the intended scope *solely* in terms of current operation ignores both the plain and unambiguous language of the applicable EPA Records of Decision and the Plant 83/General Electric system's demonstrated ability to monitor for contamination over an extended area, and to expand and adjust in light of credible sample data evidencing the presence of additional contamination in need of treatment. Plaintiffs point to no sworn averment of evidence in specific, factual form in this record evidencing that the intended scope of the remedial action is anything other than what the applicable ROD documents say it is.

The stated goal of the remediation is to eliminate the present and future risks posed by Plant 83 contamination at the Site. (*See* United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), at 17 ("The selected remedy is protective of human health and the environment through the elimination of present and future risks posed by the site.").) That goal was mirrored in the Final Work Plan for the Plant 83/General Electric Operable Unit: "The choice of extraction system will be based on selecting the system that will capture all the CERCLA-actionable contamination most effectively."[35]

As explained above, the ROD anticipated the monitoring of groundwater in the area during and after the remediation to ensure that the remedy is effective. The

34. *See, e.g., Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1283 (10th Cir.2002) ("When determining whether there exist issues of material fact and whether the movant is entitled to judgment as a matter of law, a court looks at the record and the reasonable inferences from the record in the light most favorable to the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996).").

35. (Geoscience Consultants, Ltd., Final Work Plan for the Former Air Force Plant 83/General Electric Operable Unit, South Valley Superfund Site (July 20, 1990), at 34, Exhibit C to ACF 4/27/2004 Br.)

ROD even anticipated the absence of a low-permeability clay layer preventing migration of contaminants deeper into the aquifer: "Two areas will require further definition of ground water contamination during remedial design through installation and sampling of additional monitoring wells." These were the "extent of shallow zone contamination north of the property" and, "should the clay aquitard be discovered to be absent during this investigation, *the extent of contamination in the deeper zones* as well, . . ." [36]

By definition, then, the remedy ordered by the EPA for the Plant 83/General Electric facility invokes a dynamic combination of monitoring and treatment systems, and the intended scope of the existing EPA remediation encompasses the clean-up of any groundwater contamination beneath the South Valley Site detectable at levels higher than applicable standards [37] and resulting from releases or discharges of hazardous materials from the Plant 83 facility. Thus defined, the intended scope of the existing EPA remediation would encompass Plaintiffs' alleged "deep, deep contaminant plume," even assuming that plume exists and is attributable to the

Defendant's conduct at the Plant 83 facility.

As to Defendants General Electric and ACF Industries, therefore, Plaintiffs have failed to come forward with sworn averments of significant, probative evidence in specific factual form showing the existence of "chemical contamination of the groundwater underlying the South Valley Site that exists beyond the reach of CERCLA (*e.g.,* petroleum hydrocarbons only) and/or outside the intended scope of the existing EPA remediation" sufficient to raise a genuine issue for trial on the element of injury.

### E. Summary Judgment & Plaintiffs' Damages Theory

Early in the Pretrial Conference, the court advised Plaintiffs' counsel that "the State needs to rethink its theory of damages," particularly in terms of possible restoration of use of the resource, and warned that the court "would find it difficult to send those computations to a jury" in light of the questions raised by pending motions for summary judgment on the damages question. (Tr. 10/3/2002, at 736:23, 738:4–5 (The Court); *see also* Transcript of Hearing, dated November 19, 2002, at 1079:19–

---

**36.** (United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), at 16 (emphasis added).)

**37.** Plaintiffs' counsel attempt to raise some question concerning the "applicable or relevant and appropriate requirements" (ARARs) under the terms of the applicable ROD. (Pltfs' Resp. (GE/ACF) at 1–5.) By its own terms, the ROD adopts both the federal MCL standards and the NMWQCC discharge/abatement standards as the required level of treatment: "Water extraction will continue until the levels of contaminants in the water fall below State and Federal regulatory standards. . . . The level of treatment in the selected remedy for groundwater does meet the standards for

water set by maximum contaminant limits under the Safe Drinking Water Act and for the discharge to the ground under NMWQCC regulations." (United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), at 16, 17, Exhibit B to GE 4/23/2004 Br. & Exhibit B to ACF 4/27/2004 Br.)

It makes sense that the remediation—abatement, really—of hazardous waste by an administrative action expressly approved and overseen by the State of New Mexico through NMED would be required to meet the published New Mexico regulatory standards governing the abatement of hazardous waste through administrative action.

No genuine dispute on this point appears in this record.

23 (The Court); Transcript of Hearing, dated January 17, 2003, at 1555:8–1557:2 (The Court).)

Court and counsel have revisited the question of Plaintiffs' theory of injury and damages as the Pretrial Conference has progressed,[38] and in each instance, the court deferred its final ruling on the Defendants' motions for summary judgment, affording Plaintiffs' counsel the opportunity to reexamine their own theory in light of the existing record in this case and questions raised during the conference. While making some adjustments in light of the court's February 6, 2003 bench ruling on the New Mexico drinking water standards to be applied in defining the loss of use of contaminated groundwater, Plaintiffs' counsel have pressed essentially the same theory of damages as they asserted at the beginning of the conference.

Under the damages theory propounded by the Attorney General and her outside counsel prior to this court's April 6th Order, the State of New Mexico—as "owner" and public trustee of all of the waters belonging to the public in the State of New Mexico, and as *parens patriae* for and on behalf of the people of the State of New Mexico—proposed to stand idle and do *nothing* further to clean up toxic contamination beneath the South Valley Site that counsel insist will go untreated by the existing remedial actions. Instead, the State of New Mexico, by and through the Attorney General, sought to be paid *billions* of dollars in damages—*not* to clean up the deep groundwater contamination they insist can be found beneath the South Valley Site, but to leave that contaminated water exactly as they allege it is, untreated

and unusable, and to tie up an additional 200,000 acre-feet of otherwise usable water as a "buffer zone" intended to keep the contaminants from migrating towards active supply wells, and somehow to maintain that· "buffer zone" for many, many years into the future.

Upon close examination, however, Plaintiffs' theory proved to be flawed in several fundamental respects, both factual and legal.

First, Plaintiffs' counsel and Plaintiffs' experts assumed for the sake of their damages claim that the injury to the groundwater beneath South Valley is both *total* and *permanent*—that once contaminated, the affected groundwater could never again be put to beneficial use. Plaintiffs' counsel and Plaintiffs' experts insisted that passive *containment* of the contaminants—leaving the injury in place, as it is, untreated and unabated—was in every instance to be preferred over any other remedial approach, even though doing so would deny the public the use of over 200,000 acre-feet of potable water for decades into the future.

Second, Plaintiffs' experts have persistently defined the alleged "injury" to include contamination known to be attributable to *non-party* sources, *e.g.*, the Univar Edmunds Street facility. Dr. Williams acknowledges that he included Univar contaminants in making his estimates of contaminant plume volume and location. (*See* May 7th Order at 31–32.) Mr. Johnson and Stetson Engineering likewise included non-party contaminants by defining "injury" in terms of the geography of the State Engineer's 1988 "restricted pumping

---

**38.** (*See* Transcript of Hearing, dated October 2, 2002 at 336:15–362:10; Tr. 10/3/2002, at 704:17–748:14 and 757:3–761:8; Transcript of Hearing, dated January 16, 2003, at 1423:20–1495:23; Transcript of Hearing, dated January 17, 2003, at 1503:16–548:17; Transcript of Hearing, dated February 4, 2003, at 1566:5–1649:22, 1651:1–1739:3; Transcript of Hearing, dated February 5, 2003, at 1778:12–1815:1; Tr.8/6/2003, at 1970:9–2128:7; and Transcript of Hearing, dated January 8, 2004, at 4103:10–4150:16.)

zone,"—a large, roughly rectangular prism of groundwater and earth defined by a press release without regard to source.[39] Indeed, all of the expert testimony proffered by the Plaintiffs concerning damages shares this common flaw: the inclusion of identifiable chemical contaminants attributable to sources other than the Defendants in this action in defining the volumes of groundwater purportedly lost to use.

Thus, the Attorney General of New Mexico and her outside counsel have been demanding that the remaining Defendants in this action compensate the State for injury to the groundwater resource that Plaintiffs openly concede these Defendants did *not* cause.

■ New Mexico law does not impose tort liability for public nuisance or negligence without regard to fault.

"Liability based on fault is the cornerstone of tort law...." *Scott v. Rizzo*, 96 N.M. 682, 689, 634 P.2d 1234, 1241 (1981). "The law of torts, with the exception of strict products liability, is a fault-based system of recovery; without fault, there is no liability for injury." *Berlangieri v. Running Elk Corp.*, 134 N.M. 341, 76 P.3d 1098, 2003 NMSC–024 (N.M.2003).

Third, Plaintiffs' damages theory misconceived the impact of the alleged injury on the State's interest in making public water available for appropriation by the public. Plaintiffs' counsel insist that because of contaminants, it cannot make a *specific volume* of groundwater located in the vicinity of Albuquerque's San Jose 6 Well available for appropriation, and that the State's ability to make water available for appropriation has been diminished to that extent, regardless of the availability of an equivalent volume of potable water at a different point of diversion from the same aquifer, *e.g.*, the Burton 4 Well. Plaintiffs'

counsel have argued that this specific volume of groundwater "was taken out of service in 1980" and "has remained out of service up to the present date, and will continue to remain out of service for the foreseeable future." (Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 5.) Pointing to a loss of extractive services that " 'began in the fall of 1980 with the shut-down of San Jose 6,' " they have equated the San Jose well field's "loss of capacity to provide a volume of water to the public on and after the closure of municipal well SJ–6" with their asserted injury to the State's interest in making water available for appropriation. (*Id.* at 6.)

So you are dealing with a loss of use, if you will, for a volume of water that started back in the '80s, when they took this area out of commission with SJ6 and SJ3, and continues in the future until the MCL plumes are remediated to such an extent that one could start using that water again without the deleterious effects.

(Tr. 8/6/2003, at 1999:19–25 (Mr. Lewis)); *see* Transcript of Hearing, dated January 8, 2004, at 4117:2–4121:5 ("[E]ven though the surface water is fully appropriated, you've got a volume of groundwater that has remained unusable and will remain unusable for the indefinite future.") (Mr. Lewis); Tr. 8/6/2003, at 2012:9–10 ("The water, itself, at South Valley right now is not subject to appropriation." (Mr. Lewis).)

■ Yet under New Mexico law, "The appropriator does not acquire a right to specific water flowing in the stream, but only the right to take therefrom a given quantity of water, for a specified purpose."

---

**39.** The 1988 restricted pumping zone also encompasses groundwater being treated by the General Electric/Plant 83 system, outside the scope of Plaintiffs' pleaded claims.

*Snow v. Abalos,* 18 N.M. 681, 140 P. 1044, 1048 (1914).

If appropriators only acquire the right to divert a specific *quantity* of water from a stream or aquifer to a beneficial use, and not a right to *specific water,* be it located beneath South Valley or elsewhere, then the relevant inquiry is whether the total *quantity* of water the State may make available for appropriation has been diminished. It does *not matter whether that* quantity is pumped from the San Jose 6 Well, the Burton 4 Well, or elsewhere, so long as that quantity remains available for appropriation to a beneficial use.

Apparently misapprehending New Mexico law on this point, Plaintiffs' counsel have insisted that the contamination at South Valley has reduced the water the State may make available for appropriation because *specific water* in and around a contaminant plume beneath South Valley cannot be used—regardless of the fact that existing appropriators have not been demonstrably impaired in the exercise of their rights to use given *quantities* of water extracted from the Middle Rio Grande Basin aquifer, and regardless of the constraints on further appropriation of additional *quantities* of Middle Rio Grande Basin water resulting from, *inter alia,* the State's continuing duty to comply with the Rio Grande Compact.

Fourth, Plaintiffs' damages theory sought to maximize the dollar amount of their damages award, largely unconstrained by practical considerations. For example, Plaintiffs asserted the *loss of use*

of a volume of groundwater *one thousand feet* in depth, knowing that such groundwater would never actually be fully extracted for use because doing so would exceed what Dr. Williams termed the "safe minimum yield," representing the " 'volume of water below which you will potentially cause subsidence,' " (May 7th Order at 42–44 & n. 46 (quoting Tr. 12/9/2003, at 2516:22, 2517:1–2)), subsidence of the earth that would certainly result if the water level in the aquifer dropped four hundred feet, (*id.*), or even as little as two hundred fifty feet. Plaintiffs' damages experts hypothesized the loss of use of that entire "stock" volume of groundwater as "drought reserve" over a period of thirty years, unhindered by the practical limitations on such extraction that even Dr. Williams acknowledged—limitations primarily relating to the question of how that "temporary surplus" drawn from the "drought reserve" would be recharged: " 'you have to eventually have programs for recharging or allowing the water levels to recover. *You can't just keep draining the aquifer.'* " (*Id.* at 44) (quoting Tr. 12/9/2003, at 2518:10–12 (emphasis added).)

Plaintiffs also sought the market value "replacement cost" of nearly a quartermillion acre-feet of groundwater that they concede still remains clean enough to drink—water that would only be "lost" to appropriation and use by reason of Plaintiffs' "buffer zone" containment theory. This element of Plaintiffs' claimed damages underscores the effort in Plaintiffs' damages theory to maximize rather than mitigate the State's asserted losses.[40]

---

40. As the April 6th Order observed:
    [I]t may well be that the State of New Mexico has suffered an *injury* to its interest in the groundwater underlying the South Valley Site, notwithstanding the fact that much of the groundwater meets the New Mexico drinking water standards, but it may be that the injury is *not* the total and permanent loss of drinking water services that Plaintiffs now assert.

    To date, however, Plaintiffs have proffered no significant probative evidence of any *diminution in value* of the groundwater, measured by the difference between its current condition and its formerly pristine state, apart from the alleged loss of drinking water services. No expert witness has testified as to the economic value of water that may prove to be drinkable, but still not pristine.

The goal of Plaintiffs' original damages theory was unequivocal:

THE COURT: As I understand in this case, you're asking for money. You're not asking for remediation, you're asking for money.

MR. LEWIS: That is correct.

.     .     .     .     .

THE COURT: Your effort here, as I understand it, isn't to have them fix [the deep contaminant plumes], and you don't want to fix them, apparently. You want money, and that's it.

MR. LEWIS: Well, in this courtroom, that is it, yes....

.     .     .     .     .

[I]t would be about $157 million to 623.4 million, depending on -

THE COURT: You say that's a quantity of water that is permanently damaged and can't be remedied? That's it?

MR. LEWIS: That is correct....

(Tr. 8/6/2003, at 2000:1–4, 2001:18–23, 2015:20–25.)

So long as the damages award would be large enough, the Attorney General of New Mexico—asserting the State's standing as public trustee of the public's interest in the waters of the State of New Mexico and as *parens patriae* of the people of the State of New Mexico—has been content to assume that nothing further could be done to protect the public health and safety against the grave risks to health and safety that Plaintiffs insist the contaminants pose.

THE COURT: As I understand it, your argument is that the lower depths of the plume can't be fixed; people can't pump it out and treat it.

(April 6th Order at 43.) In this case, the Attorney General has never advocated that damages "should be measured (as) to how it is now and how it was ... in its pristine state," the traditional New Mexico diminution of value measure applied in property damage

MR. LEWIS: People can pump out some of it, and they can treat some of it. But as you asked the question, you're exactly correct.... [T]he lower below the remediation system are not being fixed, and *I've not seen any evidence that the defendants have shown that they even can be fixed* ......

THE COURT: ... As I understand it, you say that you've been damaged, as far as water is concerned, up to six-hundred-plus that's incapable, as I understand it, of being remedied with anything but money.

MR. LEWIS: That is correct, based on the things we know today, the things that—the current design of the remediation system, and what you can tell from the planning that went into it as to what the future will hold as to that, and the projections. In fact, that's exactly the way we've calculated it. *We've assumed that as being true*, which, as best I can determine, is an appropriate way to do it.

(Tr. 8/6/2003, at 2001:3–13, 2016:16–2017:4 (emphasis added).)

In this case, however, the burden of proving the fact of total and permanent injury remains on the Plaintiffs, and as this court concluded in the April 6th Order, Plaintiffs failed to come forward with significant probative admissible evidence of specific facts showing that nothing can be done to restore the contaminated groundwater to beneficial use, specific facts showing that the alleged injury is either total or permanent—specific facts upon which a reasonable jury could find in Plaintiffs' favor at trial—and could not

cases; instead Plaintiffs' counsel consistently propounded a total "replacement cost" measure premised upon a total and permanent loss of use. (*See* April 6th Order at 44–63, 118–133.)

avoid summary judgment on this issue. (April 6th Order at 54–64.)

Now, apparently conceding this point, Plaintiffs' counsel assert that their experts had already investigated "the feasibility of remediating and restoring the groundwater at South Valley and the reasonable and necessary costs associated with that restoration and remediation." (Pltfs' Resp. (GE/ACF) at 9 (citing Affidavit of Thomas M. Stetson, P.E., and Stephen B. Johnson, P.E., Stetson Engineers, *Estimated Present Value Cost to Investigate and Attempt to Partially Clean Up the South Valley Aquifer* (January 29, 2003)).)

> As is evident from the Stetson report, *it is technically feasible to design a remediation system to address the contaminant plumes that are beyond the scope of the existing EPA remediation.* Stetson Engineers and Stephen Johnson possess the necessary expertise to design and implement such a remediation system, as evidenced during testimony of Mr. Johnson in the more recent Rule 702 hearings.

(*Id.* at 9–10 (emphasis added).) Now, Plaintiffs' counsel assert that as to the "deep, deep" contaminant plume,

> We think that that contamination exists and, yes, we believe that contamination needs to be addressed in terms of cleaning it up, as the Court indicated in its order.
>
> .    .    .    .    .
>
> So our experts are in line with the suggestion made in the Court's order of April 5th, putting together a cost estimate of the remediation and restorative costs in line with the Court's order for cleaning up the contamination that I will call the deep-deep aquifer contamination

that's there, investigating it, response cost, et cetera.

(Tr. 5/12/2004, at 4157:19–22, 4158:16–22 (Mr. Lewis).[41])

Given the transient and remediable nature of Plaintiffs' alleged injury, and the Plaintiffs' duty under New Mexico law to mitigate damages by taking action to avoid those injurious consequences of the Defendants' wrongful conduct that may reasonably be avoided, the damages question presented at the May 11–12 Final Pretrial Conference was whether the Plaintiffs have established a triable issue as to *any* amount of damages within the scope of their remaining claims.

### F. Summary Judgment & the Hydrocarbon Remediation Agreements

When the Chevron/Texaco Defendants first sought summary judgment based upon the HRA release language, this court denied their motion on the ground that there was a genuine issue concerning the intended scope of that release language. (See Transcript of Hearing, dated October 4, 2002, at 790:2–8 (The Court).) The court reiterated this view in the April 6th Order: "The intended scope of the NMED release language *vis-a-vis* the Attorney General's state tort damages claims remains in genuine dispute, and if necessary, will be resolved at trial." (April 6th Order at 77.)

However, even assuming that Plaintiffs are correct that exceptions to the HRA release language preserved the Attorney General's right to pursue all of the claims originally pleaded in this action, at this point the question is: what remains?

---

**41.** Much earlier in the Pretrial Conference, Plaintiffs' counsel assured the court that "[o]ur expert testimony is to the extent that it will not be resolved and cannot be resolved in that manner," referring to the restoration of contaminated groundwater to use through wellhead treatment. (Tr. 10/3/2002, at 745:18–20 (Mr. Gallagher).)

First, the Plaintiffs voluntarily dismissed their CERCLA claims against the Chevron/Texaco Defendants with prejudice. Those claims and the remedies they entailed are no longer before the court.

Further, the Plaintiffs' remaining claims against the Chevron/Texaco Defendants for statutory and common-law public nuisance are grounded upon New Mexico law, and as detailed in this court's April 6th Order, are constrained by New Mexico law in several important respects, (*see* April 6th Order at 80–82, 89–117), and by Plaintiffs' own pleadings in others. (*See* Consolidated Complaint at 3 ¶¶ 4–5; pages 8–10, *supra.*)

**1. Avoidable Consequences & Plaintiffs' Duty to Mitigate**

■ Under the doctrine of avoidable consequences, New Mexico law expects parties suffering injury through the conduct of others to take action to mitigate those consequences of the injury that can in fact be avoided or reduced. *Acme Cigarette Services, Inc. v. Gallegos,* 91 N.M. 577, 583, 577 P.2d 885, 891 (1978) (Hernandez, J, specially concurring) ("Under the doctrine of 'avoidable consequences' the injured person has the duty to use reasonable diligence to mitigate damages incurred either from tort or breach of contract.") (citing *Mitchell v. Jones,* 47 N.M. 169, 138 P.2d 522 (1943) ("It is well settled that a party must use reasonable diligence to mitigate the damages about to be suffered either from tort or breach of contract."), and *Rutledge v. Johnson,* 81 N.M. 217, 220, 465 P.2d 274, 277 (1970) ("Under the doctrine of avoidable consequences a person injured by the tort of another is not entitled to damages for harm which he could have avoided by the use of due care after the commission of the tort.")); *see also Ledbetter v. Webb,* 103 N.M. 597, 605, 711 P.2d 874, 882 (1985) ("the principle of avoidable consequences or mitigation of damages is applicable to torts both negligent and intentional."); *Selgado v. Commercial Warehouse Co.,* 88 N.M. 579, 581, 544 P.2d 719, 721 (1975) ("plaintiff cannot recover damages for injuries … if plaintiff could reasonably have avoided these consequences. This is called the doctrine of 'avoidable consequences'.")

The Chevron/Texaco Defendants argue that, like the EPA-ordered General Electric/Plant 83 remediation, the remedial actions initiated, orchestrated and agreed to by the State of New Mexico in the Hydrocarbon Remediation Agreements are also dynamic in nature, and capable of being adapted and expanded to address additional contamination originating from Chevron or Texaco sources, should such additional contamination be detected. The State of New Mexico thus has the means available to avoid further consequences flowing from any purported "deep" contaminant plume(s) beyond the reach of the current Chevron and Texaco HRA treatment systems, the expense of which would be borne by the Chevron/Texaco Defendants, without incurring further costs of restoration or remediation that would be recoverable as tort damages in this proceeding.

Earlier in the Pretrial Conference, the court raised the question of mitigation:

THE COURT: But in dealing with the matter involving the petroleum exception, which is an exclusive State matter, it seems to me that with the existing state statutes involving remediation, as I understand it, there's been no effort to remediate those problems. You're simply interested in seeking a money amount. You're asking for dollars. And I can understand that. But in reference to mitigation, there's been no effort to use the State facilities for remediation, as I understand it.

MR. LEWIS: Well, Mr. Branch is maybe better prepared than I to talk about Chevron Texaco, the petroleum

people that you're talking about, but it's my understanding that there's been quite a bit of remediation that has gone on that has been worked out between the State and the petroleum defendants. So, I mean, if I am an injured party and I'm talking to somebody about it and they're doing it, then under those circumstances, *I don't know that I would be spending the money to duplicate their efforts.*

THE COURT: But you're asking for money from that, obviously.

MR. LEWIS: To the extent that there is still a damage under state law, particularly even in areas that their contaminants have migrated to and play a role in this area, or a portion of this area, that is the restricted area that's been taken out of use, yes, sir, that's correct.

(Tr. 8/6/2003, at 2004:25–2006:2 (emphasis added).)

The court's ruling on the applicable measure of damages brings into sharp focus the question whether at this stage the Plaintiffs should recover an award of damages based precisely upon whether the State will "be spending the money to duplicate their efforts" in conducting further remediation in connection with the Chevron and Texaco facilities.

Under this court's April 6th Order, Plaintiffs may recover damages beyond the relief available under CERCLA, measured by the cost of restoration of contaminated groundwater to potability—for use as drinking water—assuming the State has or will be incurring such costs, but only to the extent that the State could not avoid incurring those costs through other reasonable means.

### 2. NMED Primary Jurisdiction & Plaintiffs' Remaining Claims

The Chevron/Texaco Defendants submit that restoration of injured natural resources to use, whether it be termed "response," "remediation" or "abatement," falls within the primary jurisdiction of NMED, and that an award of damages representing the cost of abatement equates with abatement itself. Therefore, it is for NMED, not this court, to address in the first instance Plaintiffs' claims concerning the migration of contaminants attributable to the Chevron and Texaco facilities.

This court agrees that at least in part, the remedies available under Plaintiffs' remaining state law claims against the Chevron/Texaco Defendants fall within primary jurisdiction of NMED. This conclusion is based on the clear statutory authority of NMED over the issues that are the subject of those remaining state law claims. Indeed, under their statutory and common-law public nuisance claims, the Plaintiffs' sole available judicial remedy may be an equitable decree requiring abatement of the nuisance itself—relief that Plaintiffs concede to fall within NMED's primary jurisdiction under New Mexico law.

In creating NMED, the New Mexico Legislature announced its intent to:

> [C]reate a department that will be responsible for environmental management and consumer protection in this state in order to insure an environment that in the greatest possible measure will confer optimum health, safety, comfort and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by the environment; and will maximize the economic and cultural benefits of a healthy people.

N.M. Stat. Ann. § 74-1-2 (Repl.2000). In addition to this general grant of authority over environmental matters, NMED was specifically granted the responsibility for maintaining, developing and enforcing

rules and standards with regard to water supply and nuisance abatement. N.M.Stat. Ann. § 74–1–7(A)(2), (7) (Repl. 2000). The Environmental Improvement Act specifically provides that NMED serves as the "agent of the State in matters of environmental management" and has the duty to enforce the regulations relating to environmental management. N.M. Stat. Ann. § 74–1–6(E), (F) (Repl. 2000). NMED was granted the specific power to "enter into investigation and remediation agreements" with responsible parties at CERCLA sites, and also has the power to bring suit to carry out its duties. N.M. Stat. Ann., § 74–1–6(A), (D) (Repl. 2000).

As noted in this court's April 6th Order, based on this statutory scheme, the New Mexico Supreme Court has held that NMED has primary jurisdiction over claims such as those now being asserted by Plaintiffs. *See State ex rel. Norvell v. Arizona Pub. Service Co.*, 85 N.M. 165, 170–72, 510 P.2d 98, 103–05 (1973) (dismissing public nuisance abatement claims brought by Attorney General, environmental groups, and individual because NMED had primary jurisdiction); *see also Valdez v. State*, 132 N.M. 667, 671, 54 P.3d 71, 75 (2002) (affirming trial court's determination that case fell within primary jurisdiction of administrative agency and the resulting dismissal). (April 6th Order at 104–05.)

Plaintiffs acknowledge that "NMED has the legal authority to bring actions for enforcement, abatement, and, in limited circumstances, to recover expenditures made by the State of New Mexico." (Pltfs'

Resp. (Chev/Tex) at 6 ¶ 14.) They have conceded that NMED has primary jurisdiction over restoration and abatement,[42] but argue that their claims for monetary damages fall outside of NMED's primary jurisdiction.

The Chevron/Texaco Defendants respond that there is simply no rational basis for distinguishing between an action seeking abatement and restoration and an action seeking to recover the future *costs* of abatement and restoration.

Plaintiffs also acknowledge that NMED has asserted its jurisdiction over the petroleum contamination in the South Valley and through the HRAs has required Chevron and Texaco to implement remediation systems designed to abate the contamination. Indeed, NMED expressly invoked its jurisdiction pursuant to, *inter alia*, the New Mexico law of statutory and common-law public nuisance in making the HRAs themselves. (*See* Chevron HRA at ¶ 8; Texaco HRA at ¶ 7 (citing N.M. Stat. Ann. §§ 30–8–1, 30–8–2, 30–8–8).) The HRAs thus represent a state administrative remedy footed upon a public nuisance liability theory.

In April, the court observed that under the terms of the HRAs and in light of NMED's primary jurisdiction over abatement, "equitable relief seeking abatement of groundwater contamination within the scope of the HRAs may not be available to Plaintiffs in this action at least as against Chevron/Texaco, and the same may be true of damages measured in terms of the cost of abatement or restoration, at least

42. Plaintiffs have long conceded that the Environmental Improvement Division, NMED's predecessor, "has primary jurisdiction over pollution control." (Response of Plaintiff State of New Mexico to Motion of Chevron USA Inc. for Summary Judgment, filed November 13, 2000 (dkt. no. 212), at 15–16 (citing A.G.Op.1978 No. 78–12 and *Norvell*);

Plaintiffs' Response to Chevron and Texaco's Motion for Partial Summary Judgment, filed August 30, 2002 (dkt. no. 723), at 4 ¶ 14 (NMED "has the legal authority to bring actions for enforcement, abatement, and in limited circumstances to recover expenditures made by the State of New Mexico.").)

within the scope of the existing HRA remedial actions." (April 6th Order at 78.)

### 3. Injury & Damages Beyond the Existing Chevron/Texaco Remedial Systems

The Chevron/Texaco Defendants assert that in effect, Plaintiffs have already recovered their potential damages for contamination attributable to Chevron and Texaco because the cost of restoration is already being borne by these defendants under the HRAs, and there are no further damages that Plaintiffs can recover. (Chevron and Texaco Defendants' Renewed Motion for Summary Judgment Based on the Hydrocarbon Remediation Agreements, filed April 23, 2004 (dkt. no. 1069), at 8–9.) "Quite simply, the HRAs have already provided the State with the full measure of relief to which it might be entitled." (*Id.* at 9.)

> Plaintiffs respond that, *inter alia,*
>
> the Chevron and Texaco Defendants have not submitted any evidence showing that their abatement work is in compliance with the HRAs, and Plaintiffs have discovered the presence of more pollutants at the Chevron and Texaco facilities since the date of the HRAs. Thus, the scope of the HRAs is not broad enough to cover all of Plaintiffs' state law claims.

(Pltfs' Resp. (Chev/Tex) at 13.) Of course, whether these defendants' "abatement work is in compliance with the HRAs" is a question first to be addressed by the State of New Mexico through NMED, pursuant

to the terms of the HRAs. In suggesting that there exists additional contamination attributable to these defendants that lies beyond the scope of the HRAs,[43] Plaintiffs appear to be treating the HRA remediations as static rather than dynamic remedies.

### 4. The Intended Scope of Remediation Under the HRAs

The express purpose of the HRAs is to deal with petroleum contamination through "the investigation, design and implementation of appropriate response actions." (Chevron HRA ¶ 14; Texaco HRA ¶ 13.) The Statement of Work appended to each HRA details the "investigative and remedial undertakings" that Chevron and Texaco agreed to complete "under NMED's supervision" to remediate "Petroleum–Product Constituents." (Chevron HRA ¶ 7; Texaco HRA ¶ 6; Chevron HRA, Appendix A ("Statement of Work"), Section 1.4; Texaco HRA, Appendix A ("Statement of Work"), Section 1.4.) The HRAs require Chevron and Texaco to remediate groundwater to specified levels, incorporating both the federal drinking water standards and the NMWQCC abatement standards. (Chevron HRA, Appendix A ("Statement of Work"), Section 1.5.2;[44] Texaco HRA, Appendix A ("Statement of Work"), Section 1.5.2.) The HRAs require Chevron and Texaco to pay for the remediation, including associated NMED oversight costs. (Chevron HRA ¶ 15; Texaco HRA ¶ 14.)

---

43. Plaintiffs neglected to point out a sworn averment of specific facts in the existing record supporting this assertion.

44. "For Petroleum–Product Constituents with a health based standard," Chevron is required to "remediate ground water to the more stringent of" (1) standards set forth in the NMWQCC water quality regulations, (2) MCLs established by the EPA, or (3) "to a

level representing an increased lifetime cancer risk of 1 in 100,000 ($10^{-5}$) for any Petroleum–Product Constituent or combination of Petroleum Product Constituents." (*Id.* at ¶ 1.5.2(1).) Chevron must "remove any Petroleum–Product Constituents or equivalent Toxic Pollutants listed in Section 1–101.ZZ of N.M. WQCC Regulations," as well as "any phase separated hydrocarbons from the subsurface." (*Id.* at ¶ 1.5.2(3), (4).)

Thus, legal responsibility for abatement of the contamination to meet federal and State drinking water and abatement standards, as well as the costs to restore the groundwater, has already been imposed on Chevron and Texaco by the HRAs, to be supervised and approved by the State of New Mexico through NMED.

Attempting to avoid summary judgment at the Pretrial Conference, Plaintiffs' counsel argued that the HRAs are narrower in scope than the claims asserted against Chevron and Texaco in the lawsuit and do not encompass all of the petroleum contamination in the South Valley. (Tr. 5/11/2004, at 4227:17–4228:10 (Mr. Brian Branch).) Specifically, Plaintiffs' counsel asserted that the HRAs only require Chevron and Texaco to abate shallow contamination and that the HRAs only deal with contamination confined to the Chevron and Texaco sites. *Id.* The court inquired:

> THE COURT: Can't you modify the agreement?
>
> MR. BRIAN BRANCH: Well, one of the things that can be done is, you can modify the agreement. But that's not the only way that it can be done. The other way that it can be done is, the attorney general can bring an action and seek restoration damages to . . . do restoration of what's not being done at the current time, . . .

(*Id.* at 4228:9–18.)

Counsel for the Chevron/Texaco Defendants disputed Plaintiffs' assertions as to the scope of HRA remediation:

> MS. WOOD: . . . Mr. Branch seems to believe that the New Mexico Environment Department cannot require Chevron to—or Texaco to remediate contamination any deeper than the shallow zone. As a matter of fact, if you look on page 1—and I just pulled the Texaco statement of work—it specifically states that the area to be investigated is not only the uppermost aquifer in the perched groundwater, but any deeper aquifers directly underlying the investigation area into which petroleum product constituents have migrated.
>
> So in fact, they had already written that into the statement of work, that they could require us to investigate further, as well as remediate.
>
> . . . . .
>
> [A]s to the Chevron facility, the definition of the site area or the investigation area for the Chevron facility is the Chevron facility as well as the area from Stock Drive north to Woodward Road east from the Chevron bulk terminal to the eastern extent of the petroleum hydrocarbon plume. It's not limited to the Chevron terminal.
>
> THE COURT: Okay.
>
> MS. WOOD: In addition, as to the Texaco facility, the scope of work in Section 1.2 says that the investigation area shall include but not necessarily be limited to respondents' site.
>
> It goes on to say that the investigation area may be extended beyond the site if the technical group determines that petroleum product constituents originating from the site have caused or have significant potential to cause adverse environmental health effects beyond the site.
>
> And, as you discussed earlier with Mr. Branch, while the technical group does include more than NMED, NMED in the dispute resolution section certainly reserves the right to make the final say.

(*Id.* at 4228:23–4229:11 (Ms. Wood); Transcript of Hearing, dated May 11, 2004 P.M. Session ("Tr. 5/11/2004 PM"), at 4241:3–24 (Ms. Wood).)

The express language of the Chevron and Texaco HRAs lends a degree of flexibility to the scope of the remediation, which can be expanded as needed to ad-

dress petroleum contamination. (*See* Chevron HRA, Appendix A ("Statement of Work"), Sections 1.2, 1.3; Texaco HRA, Appendix A ("Statement of Work"), Sections 1.2, 1.3; Chevron HRA ¶ 13.) Plaintiffs have come forward with no significant probative evidence contradicting the plain language of these provisions.

Pursuant to the HRAs, Chevron and Texaco have installed extensive monitoring well networks and soil and groundwater treatment systems that remove both on- and off-site contamination. (*See* Chevron HRA, Appendix A ("Statement of Work"), Section 2; Texaco HRA, Appendix A ("Statement of Work"), Section 2.) If these systems prove inadequate to the task, the State of New Mexico through NMED has the authority to require the Chevron/Texaco Defendants to perform additional work. (*See* Chevron HRA ¶ 56; Texaco HRA ¶ 51.)

MS. WOOD: So what you have happen is, one, you had a hydrocarbon remediation agreement that clearly encompassed the petroleum contamination out there that would have been attributable to Chevron or to Texaco. You had systems put in by both companies to address the contamination, and Chevron actually put in systems that are offsite of its property. You then had an instance where the State recognized that there was an issue out there that more needed to be done; there was petroleum contamination they believe was attributable to Texaco, and came to Texaco and said, "You have got to do more."

Texaco put in the system to take care of the problem, and the result is remediation of the groundwater for petroleum constituents.

So it is our strong belief that the hydrocarbon remediation agreements, the scope of that, allows for NMED to come in and address any type of petroleum contamination associated with these two properties. They have done that. . . .

(Tr. 5/12/2004, at 4388:5–25 (Ms. Wood).)

Furthermore, the Chevron and Texaco Defendants will not be released from liability under the terms of the HRAs until they have demonstrated "to the reasonable satisfaction of NMED that all of the terms of this Agreement have been completed" or "by mutual written agreement signed by the Secretary of NMED and Respondent." (Texaco HRA ¶¶ 54, 55; Chevron HRA ¶¶ 59, 60.)

THE COURT: [O]n page 15 it says that NMED shall issue a final decision. It makes the decision, doesn't it?

MR. BRIAN BRANCH: Well—

THE COURT: Including a statement of reasons.

MR. BRIAN BRANCH: I think that's probably correct, Your Honor.

THE COURT: So that ultimately, as a practical matter, the agency calls the shots. They can have all kinds of interesting technical information, but they call the shots.

MR. BRIAN BRANCH: Under that provision, I would agree with Your Honor.

(Tr. 5/11/2004 at 4224:7–20.)

### 5. The HRAs & the Plaintiffs' Duty to Mitigate Damages

Where the scope of work under the HRAs may be expanded to abate Chevron and Texaco contaminants wherever they migrate—as counsel assures the court it may—and where the State has the duty under New Mexico law to take action as to consequences that may reasonably be avoided, the logical first step is for the State of New Mexico to exercise the authority it has under the terms of the HRAs to expand the scope of the work to reach any additional groundwater contamination

attributable to the Chevron/Texaco Defendants that can be shown to exist outside the reach of the current Chevron and Texaco remedial systems.

Contamination that may be treated pursuant to the terms of the HRAs would plainly appear to be a consequence that may be avoided through reasonable efforts on the part of the State of New Mexico. And under New Mexico law, a "plaintiff cannot recover damages for injuries ... if plaintiff could reasonably have avoided these consequences." *Selgado v. Commercial Warehouse Co.*, 88 N.M. 579, 581, 544 P.2d 719, 721 (1975).

█ At this point, the intended scope of the HRA release language need not be determined because even if that language preserved all of Plaintiffs' claims pleaded in this action, as Plaintiffs argue it does, it cannot excuse Plaintiffs from the duty to mitigate damages where mitigation may reasonably be accomplished. Because the HRAs placed control of the remediation activities being performed by Chevron and Texaco in the hands of the State, the State has had the ability to mitigate its damages by requiring Chevron and Texaco to perform additional restoration, if needed, pursuant to the HRAs.

Regardless of the intended scope of HRAs' release language, the State's duty to mitigate its damages through the exercise of NMED's power to pursue further remediation cannot be circumvented by the Attorney General through the prosecution of this action.

For the reasons explained above, the Chevron/Texaco Defendants' Renewed Motion for Summary Judgment Based on the Hydrocarbon Remediation Agreements, filed April 23, 2004 (dkt. no. 1069), is granted.

### III. SUMMARY & CONCLUSION

Court and counsel have heretofore dealt with important questions involving the structure and relationship of the parties, the interesting relationship between the State of New Mexico and the United States, the relative allocation of decision-making power based upon the collective wisdom of legislative bodies, and the interplay of those kinds of decisions in seeking the resolution of the hazards present beneath the South Valley Site.

At this point, we get to the question as to whether we have genuine issues of fact, that is to say, the question of the existence of factual matters that are probative of injury and damages, and upon which a fact-finder could foot a finding in favor of the Plaintiffs.

Within the limits of time and energy, the Court has tried to consider the whole record in this case and, with the help of counsel on both sides, to figure out what finally the questions are. That has taken some extensive work on both sides over a fairly extended period of time, and the court has from time to time extended the discovery period to make sure that the parties have had adequate opportunity to flesh out the positions that they had asserted.

After some 48 months of preparation, continuing with a Pretrial Conference held over a period of some 24 days, and with the rulings made by the Court during the process, we have come down to questions in the framing of the draft Pretrial Order that are, as stated, reasonably simple questions but, as viewed, fairly complex questions.

The court has considered motions within the context of pretrial, and within the framework of the evidence that has been proffered or presented to the court, including testimony heard from the parties' experts, and to some extent, the court has passed on those motions, as reflected in the written decisions that have been filed and furnished to counsel. Indeed, the rul-

ings reflected in this opinion must be read in conjunction with the court's April 6th Order, which undertook to define the scope of the Plaintiffs' remaining claims and the appropriate legal measure of the damages remedy sought by the Plaintiffs in this case, and in conjunction with the court's May 7th Order addressing the relevance and reliability of the parties' proffered expert testimony.

It now appears that what remained in light of those opinions were questions of definition of the intended scope of the existing EPA- and NMED-supervised remedial actions at the South Valley Site. The court has tried in its own mind to deal with Plaintiffs' argument that we have what is, in effect, a static remediation system frozen in time and writ in stone, both on a federal and on a state level. But in looking at the documents, the Records of Decision, the HRAs, they indicate that we are dealing with, for want of a better word, a dynamic system, a system that's capable of adjustment, a system where people can complain and, if listened to by those who are in positions of decision-making authority, can effect a modification, a change, a reaching out, purportedly to achieve the stated goals of cleaning up a mess that someone has caused.

People should clean up their messes.

And public policy, both on a federal and a state level, has fortified that precept through the creation of remedial statutory schemes, administrative agencies, rules and regulations, purportedly to accomplish that end for the benefit of the people of a particular sovereign.

The array of existing remedial actions at South Valley—actions that the State has initiated, approved of, acquiesced in and agreed to—have largely occupied the field, leaving little or no room for the operation of the judicial damages remedy that Plaintiffs seek. The intended scope of the EPA-ordered remedy embraces all of the contamination attributable to the Plant 83 facility. The HRAs likewise seek to clean up the contamination traceable to the Chevron and Texaco facilities, and may be adjusted through expanded monitoring and treatment to follow the migration of those contaminants. And all of these remedial systems undertake to clean up groundwater sufficiently to satisfy both the federal drinking water standards and the NMWQCC abatement regulations—the end result that Plaintiffs insist that they desire to achieve.

Having no option to fashion a remedial action other than that ordered by the EPA, Defendants as responsible parties should not held individually liable in damages for an alleged deficiency in the EPA's chosen remedy. Nor for that matter should Defendants be held liable in damages for conducting State-instigated and State-approved remedial action on the theory that what the State has asked the Defendants to do will not address the full extent of the problem it was intended to remedy.

If the State of New Mexico believes that the existing remedial actions are lacking in some respect, then the State may raise its concerns with the Environmental Protection Agency on the one hand and with the signatories to its Hydrocarbon Remediation Agreements on the other.

Having again reviewed and considered the entire record, including the further memoranda of the parties and the arguments, proffers and representations by counsel, and for the reasons set forth above, the Court concludes that Plaintiffs have failed to raise a genuine issue of material fact on the essential elements of injury and damages. The Court further concludes that, as a matter of law, plaintiffs cannot satisfy their burden of proving the existence of injury or damages in conformity with the court's April 6th Order.

The Court therefore grants summary judgment in favor of General Electric, ACF Industries, and the Chevron/Texaco Defendants on each of Plaintiffs' remaining state law claims.

**SO ORDERED.**